# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# 1:18-cv-275-FDW

| | |
|---|---|
| GIVONNO CARTER, | ) |
| Plaintiff, | ) |
| vs. | ) ORDER |
| KENNITH LASSITER, et al., | ) |
| Defendants. | ) |

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment, (Doc. No. 31).

## I. BACKGROUND

Pro se incarcerated Plaintiff's Amended Complaint, (Doc. No. 6), passed initial review on his claim that he was deprived of property without due process as part of Marion Correctional Institution's Rehabilitative Division Unit ("RDU") Program. Defendants have filed a Motion for Summary Judgment, (Doc. No. 31), that is pending before the Court for consideration.

**(1)** **Amended Complaint** (Doc. No. 6)

Plaintiff alleged that he was transferred to the RDU program at Marion C.I. on May 4, 2017, that he was forced to sign papers saying that he was participating in the RDU program voluntarily, and that his personal property including mail literature, lyrics and other written work, a manuscript, legal material, religious material, hygiene items, books, and magazines, were confiscated from him. He was not allowed to keep these materials and was not allowed to use the facility storage unit even though none of his property exceeded two cubic feet, which violates

1

DPS Policy and Procedure regarding inmate personal property. Plaintiff seeks punitive damages and injunctive relief.

**(2)** **Motion for Summary Judgment** (Doc. No. 31)

Defendants argue that summary judgment should be granted in their favor because Plaintiff cannot maintain individual capacity claims against Defendants, Plaintiff cannot maintain an official capacity claim against Defendant Lassiter for declaratory and injunctive relief because he has retired, that there was no deprivation of Plaintiff's property, even if the removal of Plaintiff's property was an unauthorized act he has an adequate remedy in state court, and that Defendants are entitled to qualified immunity.

**(3)** **Plaintiff's Response** (Doc. No. 35)

Plaintiff was informed of the importance of responding to Defendants' motion as well as the legal standard applicable to summary judgment motions. (Doc. No. 34).

Plaintiff filed an unverified Letter, (Doc. No. 35), arguing that all Defendants are supervisors who allowed Plaintiff's rights to be violate and that they refused to speak to Plaintiff about the issue personally and that they failed to correct the issue. Plaintiff claims that he was on segregation on November 29, 2017 through May 29, 2018 during which time he was on radio restriction and that this action was not justified by any control purposes, which violated due process with regards to his property and disciplinary proceedings, and deprived him of his First Amendment right to access the press. Defendants illegally took some of Plaintiff's personal property upon his entry to Marion C.I. even though it did not exceed two cubic feet, including books, religious materials, mail, legal materials, hygiene items, magazines, a manuscript, and loose papers. Plaintiff was only allowed to keep 100 loose sheets. Plaintiff was forced to get rid of the excess property or send it home. He was not allowed to keep it in his possession as permitted by

policy, which states that inmates can keep two cubic feet of property. The officials violated that policy and the Fourteenth Amendment. Defendants allowed Plaintiff's civil rights to be violated when they had the power to stop those issues. Plaintiff's evidence proves that Defendants are the problem and grievances state the facts. Plaintiff wrote grievances and requested forms and other means of communication that informed all Defendants that his rights were being violated. Defendants are the prison and program supervisors and they have the authority over constitutional violations at the Marion C.I. facility. They failed to do so and allowed Plaintiff's rights to be violated. Plaintiff seeks monetary damages and injunctive relief, *i.e.*, prohibiting Defendants from taking his personal property within the two cubic foot limit and his radio without due process, and asserts his claims against Defendants in their individual and official capacities.

**(4)** **Evidence**[1]

    **(A)** **Affidavit of Gregory Swink** (Doc. No. 33-1)

Defendant Sink is Correction Programs Director at Marion C.I. As part of his job duties, he supervises and operates the RDU. He oversees the provision of programs for the rehabilitation of inmates in the prison system, which includes being accountable for the development, implementation, and maintenance of certain program activities for inmates.

The RDU program was started in February 2016 to "offer an alternative to offenders who are assigned to long-term restrictive housing for control purposes." (Doc. No. 33-1 at 5). The overarching goal of the program is to "allow an offender that would otherwise be assigned to long-term restrictive housing the opportunity to work toward a custody and control status that is more akin to general population status." (Doc. No. 33-1 at 5). The program attempts to accomplish this goad through specialized programming set up in phases. Enrollment in RDU is not voluntary.

---

[1] This section is not exhaustive.

Offenders who are enrolled in the program are selected from a pool of eligible offenders. Individuals in that pool who are aggressive or have a history of assaultive infractions are typically selected to become members of the RDU. These offenders are often "exceptionally dangerous to staff as well as other inmates." (Doc. No. 33-1 at 5). As a member moves through the phases of the program, their custody and control status moves from the initial entry level phase, which is virtually indistinguishable from long-term restrictive housing for control purposes, toward a status that is virtually indistinguishable from general population status. Once an offender becomes a member of RDU, they will remain enrolled in the program until they complete it or are moved out of it as a result of no longer meeting one of the eligibility criteria or some other exigent circumstance.

At any point in time, RDU members can be categorized as "participating" or "non-participating." (Doc. No. 33-1 at 6). Members of RDU who are actively engaged in the programming and are compliant with the programming are considered participating members. Members who actively refuse to engage in the required RDU programming or commit disciplinary infractions are considered non-participating members. A participating member of RDU can become non-participating as a direct result of his own behavior. For instance, a participating member will be considered non-participating following a serious infraction or series of infractions, or if he actively refuses to engage in the required RDU programming. Each week, a committee comprised of facility administration, unit management, medical, and mental health staff meets to evaluate special offender cases, including non-participating members of the program. Non-participating members of the program can request to participate in the program at any time through case management personnel and are offered the opportunity to participate in the program on a weekly basis. Non-participating members who express the desire to engage or re-engage in RDU

4

programming are moved to participating status as soon as possible.

Non-participating members are housed in E-unit under conditions that are virtually indistinguishable from long-term restrictive housing for control purposes. Participating members are housed in various units throughout the facility depending on their stage of the program. Completion of the RDU program typically requires 12 to 15 months of participation by members. When a member becomes non-participating, they are not typically reset back to the initial phase, but simply pulled out of the programming until they are eligible and willing to return.

Of the approximately 1,287 offenders who have been selected as members in the program since it began in February 2016, 610 have completed, 172 were released prior to completion and 28 were removed for being inappropriate placements for the program after arriving at the facility, and 456 were currently active as of October 14, 2019.

Plaintiff is currently serving a sentence for second-degree murder and is scheduled for release on July 27, 2030. See (Doc. No. 33-2 at 2). Since being placed in NCDPS custody on November 19, 2013, he has committed 47 infractions in approximately six years. (Doc. No. 33-3 at 2). Plaintiff has been enrolled in the RDU program since May 4, 2017. (Doc. No. 33-1 at 2). Since that date, he was found guilty of 16 infractions, seven of which were assaults on staff with a weapon. (Doc. No. 33-1 at 7). Plaintiff was previously assigned to "long-term restrictive housing for control purposes based on his assaultive behavior." (Doc. No. 33-1 at 8). Since becoming a member of the RDU program, Plaintiff has committed an additional 31 infractions, including "multiple assaults on staff and threats to harm or injure staff." (Doc. No. 33-1 at 8). Throughout his time in the RDU program, Plaintiff has "repeatedly incurred infractions that removed him from the programming and/or chosen not to participate." (Doc. No. 33-1 at 8). Overall, he has spent approximately 13 months housed in the E-unit as a non-participating member. While he refused to

participate in the program, he was housed in E-unit under conditions that are "virtually indistinguishable from long-term restrictive housing for control purposes." (Doc. No. 33-1 at 8). As of early October, Plaintiff had chosen to voluntarily re-engage and participate in the program. However, as of Friday October 11, 2019, he was again classified as a non-participating member. When he chooses again to participate and meet the requirements of the programming, he can expect to complete the program in 12 weeks or less. (Doc. No. 33-1 at 8).

While Plaintiff is participating and moving through the phases of the program, Plaintiff's conditions of confinement have and will continue to progress toward less restrictive conditions with increased privileges, including permission to possess additional personal property. The final phase of the program closely resembles a general-population status with the purpose of returning the successful member to that housing status upon completion of the program. If Plaintiff had not been selected to become a member of the program, "he would have remained housed under conditions that are virtually identical to the conditions under which non-participating members are currently housed in the E-unit." (Doc. No. 33-1 at 9).

The relevant NCDPS Policy & Procedure governing conditions of confinement for restrictive hosing states that offenders assigned to restrictive housing for control purposes are only permitted to have property that does not exceed two cubic feet. See (Doc. Nos. 33-4, 33-5, 33-6). Legal papers may be possessed by inmates necessary for their pending matters. Legal papers not related to pending matters may be limited and, if there is any doubt about such materials, the Director of Prisons should be contacted. Where legal materials cannot be permitted but remain necessary to an inmate, the documents are to be kept at the facility and the inmate will be given access to them as necessary. The amount of legal materials that may be possessed by an inmate is consistent with the amount of personal storage space provided to the inmate based on his custody

classification, the amount of space at the facility, and other safety and security concerns. Items of personal property including legal materials that exceed the amount permitted or can be accommodated will be disposed of, but not before providing the inmate the opportunity to mail the items to an addressee of their choice at the inmate's expense. If the inmate cannot afford the expense, the items will be mailed through the Offender Welfare Fund.

Marion C.I.'s Standard Operating Procedures ("SOPs") state that, in accordance with NCDPS Policy, offenders assigned to restrictive housing for control purposes or the RDU program are only permitted to have property that does not exceed two cubic feet. See (Doc. No. 33-7). Legal papers relevant to pending cases may be possessed, but other legal materials may be limited when necessary. Any material not meeting the criteria or exceeding the permitted amount must be mailed to an addressee of the inmate's choice. The SOPs define procedures for how to mail an inmate's personal property, including that the property will be inventoried and documented on a DC-160 form which must include the inmate's name, number, and the name and address of the person to whom the property is to be shipped.

Upon his entry into the RDU program on May 4, 2017, Plaintiff was informed that he was only allowed to keep personal property that did not exceed two cubic feet in accordance with NCDPS Policy and Marion C.I. SOPs. Plaintiff's personal property was inventoried and documented on two DC-160 forms. The first DC-160 form describes the property Plaintiff elected to keep, including a "pack of legal papers" and "25 lose [sic] papers." (Doc. No. 33-8 at 2). The bottom of the form bears Plaintiff's signature. The second DC-160 form describes 150 sheets of paper in multiple colors and poor condition. (Doc. No. 33-8 at 3). The form indicates that the property was mailed out by Plaintiff and bears his signature. Mail records confirm that this package was mailed out on May 10, 2017. (Doc. No. 33-9 at 2).

7

## II. LEGAL STANDARDS

**(1) <u>Summary Judgment</u>**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. <u>Id.</u>

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. <u>Id.</u> at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248; accord <u>Sylvia Dev. Corp. v. Calvert County, Md.</u>, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. <u>Anderson</u>, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586

(2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

As a general rule, when one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion. Celotex, 477 U.S. at 324 ; Kipps v. Ewell, 538 F.2d 564, 566 (4th Cir. 1976); Fed. R. Civ. P. 56(e). However, a verified complaint, like the Amended Complaint that Plaintiff filed, is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991); Davis v. Zahradnick, 600 F.2d 458, 459–60 (4th Cir. 1979) (holding that the factual allegations contained in a verified complaint establish a prima facie case under 42 U.S.C. § 1983, so as to preclude summary judgment).

**(2)** **Due Process**

The Fourteenth Amendment's Due Process Clause provides that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const. Amend XIV. The first inquiry in any due process challenge is whether the plaintiff has been deprived of a protected interest in property or liberty that was accomplished by state action. Tigrett v. The Rector and Visitors of the Univ. of Va., 290 F.3d 620, 628 (4th Cir. 2002); Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 172 (4th Cir. 1988). "Unless there has been a 'deprivation' by 'state action,' the question of what process is required and whether any provided could be adequate in the particular factual context is irrelevant, for the constitutional right to 'due process' is simply not implicated." Stone, 855 F.2d at 172. Moreover, "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." Daniels v. Williams, 474 U.S. 327, 328 (1986).

Where a state employee's random, unauthorized act deprives an individual of property,

either negligently or intentionally, the individual is relegated to his state post-deprivation process, so long as the State provides an adequate post-deprivation remedy. Hudson v. Palmer, 468 U.S. 517 (1984); Parratt v. Taylor, 451 U.S. 527 (1981), *overruled on other grounds by* Daniels, 474 U.S. at 327. However, post-deprivation remedies do not satisfy the due process requirement where the deprivation complained of is effected pursuant to an established state procedure rather than a random, unauthorized action. Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982).

Under North Carolina law, an action for conversion will lie against a public official who wrongfully deprives an owner of his property by an unauthorized act. Gallimore v. Sink, 27 N.C.App. 65, 67, 218 S.E.2d 181, 182 (1975). North Carolina's post-deprivation remedies are adequate. N.C. Gen. Stat. § 143-291; see Wilkins v. Whitaker, 714 F.2d 4, 6 (4th Cir. 1983) (due process satisfied where North Carolina tort law provides an adequate avenue for relief for state prisoner).

**(3)** **Qualified Immunity**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The existence of qualified immunity "generally turns on the 'objective reasonableness' of the actions" without regard to the knowledge or subjective intent of the particular official. Am. Civil Libs. Union of Md., Inc. v. Wicomico County, Md., 999 F.2d 780, 784 (4th Cir. 1993) (quoting Anderson v. Creighton, 483 U.S. 635, 639, 641 (1987)) (internal

citations omitted).

In <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims by determining whether: (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in <u>Saucier</u> is "often appropriate," it is not mandatory. <u>Pearson</u>, 555 U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. <u>Id.</u>

To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue must have been "clearly established" at the time of the defendant's alleged misconduct. <u>Thompson v. Commonweath of Va.</u>, 878 F.3d 89, 97 (4th Cir. 2017) (citing <u>Pearson</u>, 555 U.S. at 232). The analysis takes place against the backdrop of two dueling interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson</u>, 555 U.S. at 231.

To find a right is clearly established does not mean that "the exact conduct at issue [must] have been held unlawful for the law governing an officer's actions to be clearly established." <u>Amaechi v. West</u>, 237 F.3d 356, 362 (4th Cir. 2001). Rather, the court's analysis must take into consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." <u>Id.</u> at 362-63 (internal quotation omitted). The right at issue is "clearly established" for qualified immunity

purposes if:

> [t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

Anderson, 483 U.S. at 640 (citation omitted).

To determine if the right in question was clearly established, the court first looks to cases from the Supreme Court, the Fourth Circuit, or the highest court of the state in which the action arose. Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004). In the absence of "directly on-point binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." Booker v. South Carolina Dep't of Corr., 855 F.3d 533, 543 (4th Cir. 2017); Owens, 372 F.3d at 279 ("the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity."). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. White v. Pauly, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id.

### III. DISCUSSION

**(1) Due Process**

Plaintiff argues that Defendants violated due process by confiscating property that, he alleges, was beneath the two-cubic-foot limit provided by NCDPS Policy & Procedure.

As a preliminary matter, Plaintiff makes allegations in his Letter in response to Defendants'

Motion for Summary Judgment that exceed the scope of the claims that passed initial review. See generally Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 617 (4th Cir. 2009) ("a plaintiff may not raise new claims after discovery has begun without amending his complaint); Barclay v. White Skanska, Inc. v. Battelle Mem. Inst., 262 Fed. Appx. 556, 563 (4th Cir. 2008) (same). Plaintiff has not sought to file a Second Amended Complaint and the deadline to do so expired on May 2, 2019. (Doc. No. 25). Therefore, to the extent that Plaintiff attempts to raise new claims in his Letter in response to Defendants' Motion for Summary Judgment, such claims are improperly before the Court and will be disregarded.

Defendants argue that they should be granted summary judgment on Plaintiff's individual-capacity claims because he fails to demonstrate that any of the named Defendants were involved in any way in the alleged loss of his property. Defendants have submitted two property DC-160 forms pertaining to Plaintiff and allege that they demonstrate that he was not deprived of his personal property. The forms bear Plaintiff's signature and show that Plaintiff was allowed to keep some property, that he was allowed to ship excess property to an address of his choice, and that the mailing actually occurred. The staff member who handled this process was Correctional Officer Wortman, who is not a Defendant in this action. Plaintiff fails to rebut any of the foregoing with evidence of his own. See generally Smith v. Ozmint, 578 F.3d 246, 254 (4th Cir. 2009) ("Although the undersigned does not make a credibility determination, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'") (citing Scott v. Harris, 550 U.S. 372, 380 (2007)). Plaintiff's claims against Defendants in their individual capacities are unsupported by any evidence and Defendants will be granted summary judgment on this basis.

Defendant Lassiter argues that he should be granted summary judgment on the claims against him in his official capacity because he is now retired and is no longer in a position to carry out injunctive or declaratory relief. See (Doc. No. 32 at 14 n.1). The Court acknowledges Defendant Lassiter's retirement. See Fed. R. Ev. 201. However, Defendant Lassiter's Motion on this ground is moot insofar as replacement of a named official results in automatic substitution of the official's successor in office in an official-capacity action in federal court. See Kentucky v. Graham, 473 U.S. 159, 166 n.11 (1985); Fed. R. Civ. P. 25(d)(1). Therefore, the issuance of an injunction against Defendant Lassiter in his official capacity would not be defeated by his retirement and his substitution for his successor has already occurred automatically. See, e.g., Lankford v. Gelston, 364 F.2d 197 (4th Cir. 1966) (retirement of police commissioner did not affect action for injunctive relief with regards to police department's longstanding practice because "[o]ur concern is not with the person who happens to hold the office at a particular time, but with the office."). Regardless of this issue's mootness, Defendants are entitled to summary judgment for the other reasons discussed in this Section.

Plaintiff alleges that he was deprived of his personal property without due process upon his entry into the RDU program at Marion C.I. However, Defendants have presented evidence that Plaintiff's possession of property was limited to that provided under NCPDS Policy & Procedure and Marion C.I. SOPs, and that he was allowed to mail out excess property, which Plaintiff has failed to rebut. See Smith, 578 F.3d at 254. To the extent that Plaintiff claims that Defendants failed to abide by the applicable Policy and SOP, Plaintiff may proceed for such an unauthorized act under State law, which provides an adequate post-deprivation remedy.

Finally, Defendants argue that they are entitled to qualified immunity because their conduct was reasonable and did not violate a clearly established statutory or constitutional right.

Defendants presented evidence demonstrating that they did not deprive Plaintiff of property without due process and that they complied with applicable Policy and SOPs. Plaintiff has failed to rebut this evidence with anything other than his own unsupported and conclusory assertions to the contrary. Therefore, Defendants are entitled to qualified immunity and for this reason, too, they will be granted summary judgment.

### IV. CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment will be granted in part and denied in part as moot, and this case will be closed.

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion for Summary Judgment, (Doc. No. 31), is **GRANTED** in part and **DENIED** in part as moot.

2. The Clerk of Court is instructed to close this case.

Signed: November 14, 2019

Frank D. Whitney
Chief United States District Judge